JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Mark Zicherman, Derivatively on Behalf of Hemispherx, Inc.

**DEFENDANTS**
William A. Carter, Thomas K. Equels, Iraj E. Kiani, William M. Mitchell, Richard C. Piani and Charles T. Bernhardt; and Hemispherx Biopharma, Inc.

(b) County of Residence of First Listed Plaintiff   Westchester, New York
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Citizen of Pennsylvania
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
Brian M. Felgoise; Felgoise Law Firm
261 Old York Road, Suite 518, Jenkintown, PA 19046
215-886-1900

Attorneys *(If Known)*
Unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Sec.1332(a)(2) and Fed.R.Civ.P. 23.1
Brief description of cause:
Breach of Fiduciary Duties and Wasting of Corporate Assets

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE William H. Yohn, III
DOCKET NUMBER 2:12-cv-07152-WY

DATE 01/15/2013
SIGNATURE OF ATTORNEY OF RECORD

JAN 15 2013

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

FOR THE WESTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

**13    243**

Address of Plaintiff: 1512 East 14th Street Brooklyn, NY 11230

Address of Defendant: 1517 JFK Blvd. No. 660 One Penn Ctr. Phila., PA 19104

Place of Accident, Incident or Transaction: Phila., PA

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes☐  No☒

Does this case involve multidistrict litigation possibilities?    Yes☐  No☒
RELATED CASE, IF ANY:
Case Number: 12 cv 7156    Judge Yohn    Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
    Yes☐  No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
    Yes☒  No☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
    Yes☐  No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
    Yes☐  No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases*:
1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases*:
1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☒ All other Diversity Cases
    (Please specify) Sec. 1332(a)(2)

**ARBITRATION CERTIFICATION**
*(Check Appropriate Category)*

I, Brian M. Felgoise, counsel of record do hereby certify:
☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☐ Relief other than monetary damages is sought.

DATE: 1/15/13    Brian M. Felgoise    BMF1980
                 Attorney-at-Law      Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

JAN 15 2013

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 1/15/13    Brian M. Felgoise    BMF1980
                 Attorney-at-Law      Attorney I.D.#

CIV. 609 (5/2012)



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | |
|---|---|
| MARK ZICHERMAN, Derivatively on Behalf of HEMISPHERX, INC., Plaintiff<br><br>v.<br><br>WILLIAM A. CARTER, THOMAS K. EQUELS, IRAJ E. KIANI, WILLIAM M. MITCHELL, RICHARD C. PIANI and CHARLES T. BERNHARDT, Defendants<br>and<br>HEMISPHERX BIOPHARMA, INC.<br>Nominal Defendant | CIVIL ACTION<br><br>13    243<br><br>NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.    ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.    ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)    ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.    (X)

| | | |
|---|---|---|
| 1/15/13 | Brian M. Felgoise BMF1980 | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-886-1900 | 215-886-1909 | felgoiselaw@verizon.net |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

JAN 15 2013

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK ZICHERMAN, Derivatively on Behalf of HEMISPHERX, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAM A. CARTER, THOMAS K. EQUELS, IRAJ E. KIANI, WILLIAM M. MITCHELL, RICHARD C. PIANI and CHARLES T. BERNHARDT,<br><br>Defendants,<br><br>-and-<br><br>HEMISPHERX BIOPHARMA, INC., a Delaware corporation,<br><br>Nominal Defendant. | Case No. **13   243**<br><br>DEMAND FOR JURY TRIAL |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint against the Individual Defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1. This is a verified shareholder derivative action brought on behalf of nominal defendant Hemispherx Biopharma, Inc. ("Hemispherx" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law occurring from March 19, 2012 to the present. These wrongs resulted in damages to Hemispherx's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed the Company to billions of dollars in potential liability for violations of state and federal law.

2. Hemispherx is a biopharmaceutical company that focuses on the development of nucleic acids to enhance the natural anti-viral defense systems of the human body. The Company's core product, Ampligen® ("Ampligen"), is undergoing clinical trials for the treatment of Myalgic Encephalomylitis/Chronic Fatigue Syndrome.

3. Throughout the Relevant Period, Defendants made several materially false and misleading statements regarding the safety and efficacy of Ampligen, and touted purportedly positive results from Ampligen's clinical trials. As a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

4. On December 18, 2012, the FDA published an FDA staff report concerning Ampligen's safety and efficacy. Specifically, the report concluded that the Company's studies were "ill-defined and invalid" with signals of efficacy that were inconsistent between clinical trials, and based on the limited quality of the data, "it is difficult to draw conclusions regarding potential safety signals," but the "review identified nine potential safety concerns associated with Ampligen."

5. As a result of this disclosure, Hemispherx shares declined $0.276 per share or nearly 43%, to close at $0.368 per share on December 18, 2012.

6. Plaintiff brings this action against the Individual Defendants to repair the harm that they caused the Company with their faithless actions.

## JURISDICTION AND VENUE

7. The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and a citizen of a foreign state is an additional party and the matter in controversy exceeds $75,000 exclusive of interest and costs.

8. This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would otherwise not have.

9. Venue is proper in this District because a substantial portion of transactions and wrongs complained of herein occurred in this District. Defendants either reside in or maintain executive offices or participated in board meetings in this district and have received substantial compensation in this District by engaging in numerous activities and conducting business here.

10. Venue is proper in this County because Hemispherx is headquartered in this County and a substantial portion of the transactions and wrongs complained of herein occurred in this County.

## THE PARTIES

**Plaintiff**

11. Plaintiff Mark Zicherman was a shareholder of Hemispherx at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Hemispherx shareholder. Plaintiff is a citizen of the State of New York.

**Nominal Defendant**

12.     Nominal Defendant Hemispherx is a corporation organized under the laws of the state of Delaware, maintaining its principal place of business at 1617 JFK Boulevard, Suite 660, Philadelphia, PA 19103. Hemispherx's common stock trades on the New York Stock Exchange Market LLC ("NYSE MKT") under the ticker symbol "HEB."

**Individual Defendants**

13.     Defendant William A. Carter ("Carter") has served as the Company's President from April 1995 to November 2006 and then again December 2011 to the present; Chief Executive Officer ("CEO") since July 1993; Chief Scientific Officer since May 1989; and Chairman of the Board of Directors ("Board") since January 1992.  Defendant Carter is a member of the Disclosure Controls Committee.  Carter is a citizen of Pennsylvania.

14.     Defendant Thomas K. Equels ("Equels") has served as a director since 2008 and also serves as the Company's Executive Vice Chairman of the Board, Secretary, and General Counsel and Litigation Counsel.  Defendant Equels is a member of the Disclosure Controls Committee.  Equels is a citizen of Florida.

15.     Defendant Iraj E. Kiani ("Kiani") has served as a director since May 2002.  Kiani is the Chairman of the Compensation Committee and a member of the Corporate Governance and Nominating and Audit Committees.  Kiani is a citizen of California.

16.     Defendant William M. Mitchell ("Mitchel") has served as a director since July 1998.  Mitchell is the Chairman of the Corporate Governance and Nominating Committee. Mitchell is also a member of the Compensation, Disclosure Controls and Audit Committees. Mitchell is a citizen of Tennessee.

17.     Defendant Richard C. Piani has served as a director since 1995. Piani is the Chairman of the Audit Committee. Piani is also a member of the Compensation and Corporate Governance and Nominating Committees. Piani is a citizen of France.

18.     Defendant Charles T. Bernhardt ("Bernhardt") at all relevant times has served as the Company's Chief Financial Officer and Chief Accounting Officer. Bernhardt is a member of the Disclosure Controls Committee. Bernhardt is a citizen of Pennsylvania.

19.     Carter, Equels, Kiani, Mitchell, Piani and Bernhardt are referred to herein as the "Individual Defendants" or "Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### Fiduciary Duties

20.     By reason of their positions as officers, directors, and/or fiduciaries of Hemispherx and because of their ability to control the business and corporate affairs of Hemispherx, the Individual Defendants owed and owe Hemispherx and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Hemispherx in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Hemispherx and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

21.     Each officer and director of the Company owes to Hemispherx and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts

so that the market price of the Company's stock would be based on truthful and accurate information.

**Additional Duties of the Disclosure Controls Committee**

22. In addition to their general fiduciary duties, the Disclosure Controls Committee Defendants Equels, Bernhardt, Carter and Mitchell are responsible for procedures and guidelines on managing disclosure information.

23. Specifically, the Disclosure Controls Committee is responsible to ensure that information required to be publicly disclosed is properly accumulated, recorded, summarized and communicated to the Board.

**Additional Duties of the Audit Committee Defendants**

24. In addition to their general fiduciary duties, the Audit Committee Defendants, Piani, Mitchell and Kiani, owed and owe specific additional duties to Hemispherx pursuant to the Company's Audit Committee Charter.

25. The principal functions of the Audit Committee are to: (i) assist the Board in fulfilling its oversight responsibility relating to the annual independent audit of our consolidated financial statements and internal control over financial reporting, the engagement of the independent registered public accounting firm and the evaluation of the independent registered public accounting firm's qualifications, independence and performance; (ii) prepare the reports or statements as may be required by NYSE MKT or the securities laws; (iii) assist the Board in fulfilling its oversight responsibility relating to the integrity of financial statements and financial reporting process and the system of internal accounting and financial controls; (iv) discuss the financial statements and reports with management, including any significant adjustments, management judgments and estimates, new accounting policies and disagreements with management; (v) oversee the functionality related to the Disclosure Control Committee; and (vi)

review disclosures by the Company's independent registered public accounting firm concerning relationships with us and the performance of our independent accountants.

**Code of Ethics and Business Conduct**

26. Hemispherx displays on its website the Company's Business Ethics and Code of Conduct (the "Code"). The Code states that the Company is committed to maintaining an excellent record and reputation for quality and for compliance with regulatory requirements.

27. The Code also states that the "quality and integrity" of the Company's "science, data, reports and records is vital to our success."

**Corporate Governance Guidelines**

28. The Company has adopted a set of Corporate Governance Guidelines ("Governance Guidelines") to "provide effective governance over the Company's affairs for the benefit of its shareholders."

29. Pursuant to the Governance Guidelines, the Board shall have full and free access to senior management and other employees of the Company.

**Control, Access, and Authority**

30. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Hemispherx, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

31. Because of their advisory, executive, managerial, and directorial positions with Hemispherx, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of Hemispherx. While in possession of this material, non-public information, the Individual Defendants made improper representations regarding the Company's business prospects.

32. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Hemispherx, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

33. To discharge their duties, the officers and directors of Hemispherx were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Hemispherx were required to, among other things:

   a) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

   b) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

   c) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

   d) remain informed as to how Hemispherx conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

   e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**Breaches of Duties**

34. Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duty of loyalty and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Hemispherx, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of Hemispherx's Board.

35. The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to make improper statements regarding its business prospects. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of the Individual Defendants' improper actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of securities laws. As a result, Hemispherx has expended, and will continue to expend, significant sums of money.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

36. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the

wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

37. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Hemispherx, regarding the Individual Defendants' management of Hemispherx's operations and the prospects of the Company's coal business; and (ii) enhance the Individual Defendants' executive and directorial positions at Hemispherx and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

38. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements.

39. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

40. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

41.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

42.     Hemispherx, a specialty pharmaceutical company, is engaged in the clinical development of new drug therapies based on natural immune system enhancing technologies for the treatment of viral and immune based chronic disorders. According to its SEC filings, the Company's current strategic focus is based upon four applications of its two core pharmaceutical technology platforms Ampligen® and Alferon N Injection®. The commercial focus for Ampligen® includes application as a treatment for Chronic Fatigue Syndrome ("CFS") and as an influenza vaccine enhancer (adjuvant) for both therapeutic and preventative vaccine development.

43.     On March 19, 2012, Defendants caused the Company to issue a press release announcing the publication of data on the bioactivity of Ampligen in CFS. The press release stated in relevant part:

> Hemispherx Biopharma, Inc. (NYSE Amex: HEB) (the "Company" or "Hemispherx") announced the publication of a peer-reviewed article providing the results from the AMP-516 Phase III Clinical Trial of Ampligen® [rintatolimod, Poly (I) (C[12,]U)], an experimental therapeutic, in the high impact, online journal, PLoS ONE. The report is entitled "A Double-Blind, Placebo-Controlled, Randomized, Clinical Trial of the TLR-3 Agonist Rintatolimod in Severe Cases of Chronic Fatigue Syndrome". Recently, researchers from the Centers for Disease Control and Prevention ("CDC") and Harvard School of Public Health published new data showing the profound economic impact of CFS on increasing healthcare costs of $452 million and

decreasing CFS patient productivity by $1.2 billion in Georgia, a state with approximately 5.5 million people age 18-59 (Cost Effectiveness and Resource Allocation, 9:1, 2011).

In the current PLoS One publication, a Phase III, FDA authorized study in CFS evaluated the safety and therapeutic effectiveness of Ampligen®, an experimental therapeutic, in 234 subjects with debilitating CFS at 12 clinical sites in the United States. The Ampligen® treatment was generally well-tolerated....

The primary endpoint, exercise tolerance, improved an average of 21% in subjects receiving Ampligen® compared to placebo and the proportions of patients with exercise improvements of at least 25% and 50% were 1.7 and 1.9-fold greater for the Ampligen® group versus placebo ($p<0.05$). An ad hoc continuous responder analysis of exercise improvement between 25% and 50% at 5% increments demonstrated a significantly greater response for patients receiving Ampligen® compared to placebo.

The Ampligen® cohort also reduced dependence on medications used to reduce symptoms of CFS compared to the placebo group ($p<0.05$), adding additional insight to the recent CDC/Harvard study which emphasizes the overwhelming economic burden of medical care for CFS sufferers.

In 2010, Hemispherx published new data showing that a greater proportion of placebo patients in this Phase III trial were found to have a significant prolongation of the EKG QT interval compared to patients who received Ampligen®. Prolongation of the QT interval, which is a risk factor for sudden cardiac death and arrhythmias, was associated with continued use of certain drugs by CFS sufferers known to prolong the QT interval (Journal of Applied Research, 10:3, 2010). CFS patients are considered to be at increased risk for catastrophic cardiac events despite their relatively young age and the preponderance of women (approximately 2-3 women for each man) who suffer from this chronically debilitating disease.

On January 11, 2012, Hemispherx announced that the FDA had granted an extension of its pending New Drug Application ("NDA") for potential treatment of CFS, The Company is currently conducting "open-label" treatment protocol in the U.S. and evaluating new diagnostic modalities to provide additional insights into the CFS disorder.

The FDA originally concluded (Complete Response Letter received 11/25/09) that this Phase III study was inadequate to support approval of the NDA. However, the new analyses and other insights in the PLoS One report supplement the original study findings. The Company believes that continued efforts to understand existing data and to advance the development of new data and information, will ultimately support a re-filing of the NDA.

44. On July 11, 2012, Defendants caused the Company to issue a press release announcing that it had reached an agreement with the FDA on filing requirements for the Company's complete response in support of Ampligen New Drug Application ("NDA") for Chronic Fatigue Syndrome Treatment. The press release stated in relevant part:

> Hemispherx Biopharma, Inc. (NYSE MKT: HEB) (the "Company" or "Hemispherx") recently met with representatives of the U.S. Food and Drug Administration (the "FDA"). At that meeting, the FDA agreed to accept, for review, new analyses of data from Hemispherx's AMP-516 Phase III Clinical Trial ("AMP-516 Trial") in support of its New Drug Application ("NDA") for Ampligen® (Poly I : Poly C 12 U). If found sufficient to support approval of the drug, these new analyses will be in lieu of an additional confirmatory Phase III study called for in the Agency's November 25, 2009, Complete Response Letter ("CRL"). The FDA has advised that whether the new analyses provide adequate evidence of Ampligen®'s efficacy in treating Chronic Fatigue Syndrome ("CFS") will ultimately be a review issue.
>
> In its CRL, the FDA recommended at least one additional clinical study of Ampligen® in CFS patients, including at least 300 patients on dose regimens intended for marketing. In November 2010, Hemispherx announced the publication of new analyses of data from the AMP-516 Trial showing that patients on Ampligen® reduced their use of concomitant medications compared to patients receiving placebo. In particular, Ampligen® patients reduced their use of medications which may prolong the QT interval. Prolongation of the QT interval is a known risk factor for sudden cardiac death and arrhythmias. A greater portion of the placebo patients were found to have a significant prolongation of the QT interval compared to patients who had received Ampligen®, thereby creating a cardiac risk situation in the CFS patients. Cardiac death is one of three major causes of premature death in CFS, which affects predominantly women in their 40s....
>
> In March, 2012, a new peer reviewed analysis of data from the AMP-516 Trial was published showing that the proportions of Ampligen® patients with exercise improvements of at least 25% and at least 50% were, respectively, 1.7 and 1.9-fold greater than those patients on placebo. A continuous responder analysis, which examined response improvements from 25% to 50% in 5% increments, showed a greater improvement in exercise tolerance for patients receiving Ampligen versus placebo at every 5% increment above 25%....

45. On May 7, 2012, the Company filed a quarterly report with the SEC on a Form 10-Q for the first quarter ended March 31, 2012 which was signed by Defendants Carter and Bernhardt. In addition, the Form 10-Q contained certifications pursuant to the Sarbanes-Oxley

Act of 2002 ("SOX") signed by Defendants Carter and Bernhardt stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting. The 10-Q represented the following, in relevant part:

> In July 2008, the FDA accepted for review our NDA for Ampligen® to treat CFS, originally submitted in October 2007. We are seeking marketing approval for the first-ever treatment for CFS. At present, only supportive, symptom-based care is available for CFS patients. The NDA for Ampligen® is also the first ever accepted for review by the FDA for systemic use of a toll-like receptor therapy to treat any condition. In November 2009, we received a Complete Response Letter ("CRL") from the FDA which described specific additional recommendations related to the Ampligen® NDA. In accordance with its 2008 Complete Response procedure, the FDA reviewers determined that they could not approve the application in its present form and provided specific recommendations to address the outstanding issues. We intend to take the appropriate steps to seek approval and commercialization of Ampligen®. Most notably, the FDA stated that the two primary clinical studies submitted with the NDA did not provide credible evidence of efficacy of Ampligen® and recommended at least one additional clinical study which shows convincing effect and confirms safety in the target population. The FDA indicated that the additional study should be of sufficient size and sufficient duration (six months) and include appropriate monitoring to rule out the generation of autoimmune disease. In addition, patients in the study should be on more than one dose regimen, including at least 300 patients on dose regimens intended for marketing. We are examining those two major studies for further insight into efficacy and safety. In the Non-Clinical area, the FDA recommended among other things that we complete rodent carcinogenicity studies in two species. While as part of the NDA submission we had requested that these studies be waived, this waiver had not been granted by the FDA in their CRL. Under the Product Quality section of the CRL, the FDA recommended that we submit additional data and complete various analytical procedures. The collection of these data and the completion of these procedures is already part of our ongoing Quality Control, Quality Assurance program for Ampligen® manufacturing under current Good Manufacturing Practice ("cGMP") guidelines and our manufacturing enhancement program. On January 14, 2010, we submitted reports of new preclinical data regarding Ampligen® to the FDA that we believed to be sufficient to address certain preclinical issues in the FDA's CRL. We do not anticipate receiving feedback until we re-file our NDA.
>
> In January 2012, in response to our request for an additional extension, we were informed that, rather than grant additional formal requests for extension, FDA would instead await our complete response to the CRL. Therefore, unless we are informed by the FDA of the need to seek another formal extension, our NDA will remain open while we continue to prepare our response to the CRL. We are

currently conducting an open-label treatment protocol in the U.S. and evaluating new diagnostic modalities to provide additional insights into the CFS disorder. It is our plan that the new analyses and other insights will supplement the original study findings. We believe that continued efforts to understand existing data and to advance the development of new data and information, will ultimately support a re-filing of the NDA. Thus, the Company is pursuing the filing of an amended NDA in response to FDA comments in the CRL.

46.     On August 1, 2012, Defendants caused the Company to issue a press release announcing the filing of its complete response to the FDA's November 25, 2009 Complete Response Letter ("CRL") in support of Ampligen's NDA for CFS. The press release stated in relevant part:

> As previously reported, at a recent meeting with the Agency, Hemispherx reached agreement on the filing requirements for the Company's complete response (please see the Company's press release and Form 8-K dated July 11, 2012). The FDA has indicated that the new submission will be reviewed on a 6 month cycle. The Ampligen® data were organized and filed with the FDA 53 days after the June 8, 2012 meeting with the Agency. At present, no drug has received FDA approval to treat CFS, a chronic, seriously debilitating disease.
>
> The FDA has agreed to accept, for review, further analyses of data from Hemispherx's AMP-516 Phase III clinical trial and other Ampligen® trials (AMP-502 and AMP-516C) in lieu of the additional confirmatory Phase III study originally called for in the Agency's CRL. Whether these data provide adequate evidence of efficacy will ultimately be a review issue, and there can be no assurance the FDA will conclude the data are adequate to support approval of the Ampligen® New Drug Application ("NDA").
>
> Included in the additional AMP-516 study analyses submitted to the FDA is an examination of the quality of life parameters in patients who either met or failed the primary endpoint (exercise treadmill testing or "ETT"). Hemispherx believes the data show that patients who were able to continue on a treadmill for at least longer than at baseline achieved significantly greater improvement in vitality, general health perception, Karnofsky performance score, and activities of daily living compared to those that improved less than 25% in ETT.
>
> Patients who participated in the 40-week AMP-516 study were permitted to enroll in a 24-week extension study; all patients during the extension study received Ampligen® but were not informed of the treatment they received during the initial 40-week study period. The Company believes the data show that 1) the patients who received Ampligen® over the entire 64 weeks continued to improve during the 24-week extension study, experiencing a mean improvement of 23% in treadmill duration; 2) patients who crossed over from placebo to Ampligen®

experienced a mean improvement of 39% over the 24 weeks of Ampligen® treatment; and 3) the proportion of patients who improved by at least 25% in exercise duration from baseline was significantly greater for the patients who switched from placebo to Ampligen® during the last 24 weeks (30%) compared to the patients who remained on Ampligen® (11% during the last 24 weeks).

\*\*\*

In November, 2010, Hemispherx announced the publication of new analyses of data from the AMP-516 Trial showing that patients on Ampligen®, an experimental therapeutic, reduced their use of concomitant medications compared to patients receiving placebo. In particular, Ampligen® patients reduced their use of medications that may prolong the QT interval. Prolongation of the QT interval is a known risk factor for sudden cardiac death and arrhythmias. A greater portion of the placebo patients were found to have a significant prolongation of the QT interval compared to patients who had received Ampligen®. Cardiac death is one of three major causes of premature death in CFS, which affects predominantly women in their 40s....

Also, in March, 2012, a peer reviewed analysis of data from the AMP-516 Trial was published in PLoS One ("A Double-Blind, Placebo-Controlled, Randomized, Clinical Trial of the TLR-3 Agonist Rintatolimod in Severe Cases of Chronic Fatigue Syndrome") showing that the proportions of Ampligen® patients with exercise treadmill testing improvements of at least 25% and at least 50% were, respectively, 1.7 and 1.9-fold greater than those patients on placebo. ETT is an established primary efficacy endpoint which has been used in numerous clinical trials of various chronic debilitating disorders. A continuous responder analysis, which examined response improvements from 25% to 50% in 5% increments, showed a greater improvement in exercise tolerance for patients receiving Ampligen®, an experimental therapeutic, versus placebo at every 5% increment above 25%....

47.   On August 8, 2012, the Company filed a quarterly report with the SEC on a Form 10-Q for the first quarter ended June 30, 2012 which was signed by Defendants Carter and Bernhardt. In addition, the Form 10-Q contained certifications pursuant to SOX signed by Defendants Carter and Bernhardt stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting. The 10-Q represented the following, in relevant part:

On June 8, 2012, the Company and its consultants met with the FDA to discuss certain aspects of the CRL relating to its NDA for Ampligen® for the treatment of severely debilitated patients with CFS. Upon our review of the FDA Minutes